**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

    and

THE PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES,
Attorney General of the State of New York,

    Plaintiffs,

    v.

HANDY TECHNOLOGIES, INC., d/b/a ANGI
SERVICES,

    Defendant.

**Case No. 1:25-cv-122**

**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF**

Plaintiffs, the Federal Trade Commission ("FTC"), and the People of the State of New York ("State of New York") by their attorney Letitia James, Attorney General of the State of New York (collectively, "Plaintiffs"), for their Complaint allege:

1.      Plaintiffs bring this action for Defendant's violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), New York Executive Law ("N.Y. Exec. Law") § 63(12), and New York General Business Law ("N.Y. GBL") §§ 349 and 350 in connection with the advertising, marketing, promotion, or offering of household service job opportunities. Defendant's violations relate to its recruitment of consumers seeking employment opportunities through advertisements containing false, unsubstantiated, or otherwise misleading earnings claims in manners that the Commission has previously determined to be unfair and deceptive, as summarized in the Notice of Penalty Offenses Concerning Money-Making Opportunities (the "Notice") served on Defendant in October 2021. Defendant also fails to disclose or adequately disclose fines and fees that it can deduct from workers' earnings, and Defendant collects fines and fails to pay workers

1

who are impeded from completing requested jobs through no fault of their own. For these violations, Plaintiffs seek relief, including a permanent injunction, monetary relief, and other relief, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), N.Y. Exec. Law § 63(12) and N.Y. GBL §§ 349 and 350.

## SUMMARY OF THE CASE

2.      Defendant Handy Technologies, Inc. d/b/a Angi Services ("Handy") is part of the "gig" economy comprised of digital platforms that connect workers and customers. The gig economy relies heavily on temporary and part-time workers, rather than full-time, permanent employees, and many gig workers are low-income and lack job security. Gig platforms tend to manage and control many aspects of workers' experience, including setting pay, hours, and participation requirements, and processing pay.

3.      Handy operates such an online platform, accessible via its smartphone application ("App"), through which workers, called Service Providers ("Pros") can claim household service jobs that customers ("Requesters" or "Customers") have requested be performed. These household service jobs include home cleaning, handyman services, furniture assembly, and lawn care. Requesters pay Handy directly, and Handy in turn pays a portion of its fee to Pros ("Pro pay") who perform the requested work.

4.      For years, Handy has enticed consumers to become Pros by claiming that Pros can earn certain wages for jobs obtained on the Handy platform. However, Handy routinely uses inflated earnings claims. In reality, Handy's advertised earnings claims are frequently false, unsubstantiated, or otherwise misleading as they do not represent the actual amount Handy pays the vast majority of Pros in the geographic region in which the ad is running. In many instances, the amounts that Handy claims Pros can earn are virtually impossible for most Pros to achieve.

Many of Handy's ads also misleadingly claim that Pros can get "paid daily" or "as soon as the job is done" when, in fact, the default pay period is seven days after job completion. In order to get paid sooner, Pros must have already worked at least one job for Handy and pay Handy a fee for each time they seek to get paid "as soon as the job is done."

5.      Further, Handy fails to adequately disclose certain fines and fees it assesses Pros. These inadequately disclosed fines and fees are withheld, or deducted, from Pro pay, reducing their hourly rates. Since at least 2019, Handy has withheld millions of dollars in inadequately disclosed fines and fees that otherwise would have been paid to Pros as earnings. Notwithstanding these facts, Handy fails to disclose, or account for, its fines and fees reducing Pro pay in its advertised earnings claims.

6.      Handy also fails to disclose its multi-step protocol that Pros must follow to avoid being fined and to receive payment for jobs they have been impeded from completing. For instance, a Pro who travels to a job but is unable to gain access to the job site because the Requester is not present to let them in may nevertheless be fined by Handy, or have their pay withheld, if they do not comply with Handy's protocol. Because Handy does not disclose its protocol, many Pros are unfairly fined and not paid by Handy despite their time and effort to complete a job.

7.      Handy engages in the above-described deceptive and unfair practices despite awareness that many of its Pros suffer from financial hardship and rely upon jobs obtained through Handy for supplemental income. For instance, in the summer of 2019, Handy's Operations Manager acknowledged in an email to its Customer Experience Manager that "Many pros are on public assistance/housing."

8.    In October 2021, the Commission served Handy with a copy of the Commission's Notice, which stated that, by making false, unsubstantiated, or otherwise misleading earnings claims, Handy may be subject to civil penalties for engaging in acts and practices the Commission has previously determined are unfair and deceptive. Nevertheless, Handy continues to publish false, unsubstantiated, or otherwise misleading earnings claims to recruit consumers to become Pros.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

10.    This Court has supplemental jurisdiction over the State of New York's claims under 28 U.S.C. § 1367.

11.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), §1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFFS

12.    The FTC is an independent agency of the United States Government created by the FTC Act which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

13.    Plaintiff the People of the State of New York, by their attorney Letitia James, Attorney General of the State of New York ("NYAG"), brings this action pursuant to N.Y. Exec. Law § 63(12), which authorizes the NYAG to take action to enjoin repeated fraudulent and illegal acts or persistent fraud or illegality in the carrying on, conducting or transaction of business, and N.Y. GBL §§ 349 and 350, which authorize the OAG to seek injunctive relief,

4

restitution, civil penalties, and other equitable relief, including disgorgement, when a person or business engages in deceptive acts and practices and false advertising in the conduct of any business, trade, or commerce.

## DEFENDANT

14.    Defendant Handy Technologies, Inc., a wholly owned subsidiary of Angi Inc., is a Delaware corporation with its principal place of business at 555 W 18th Street, 4th Floor, New York, New York 10011. In approximately mid-2022, Handy rebranded to "Angi Services" as part of an effort to integrate its business into the Angi Inc. brand. Handy transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Handy has advertised, marketed, distributed, or sold household service job opportunities to consumers throughout the United States, including New York.

## COMMERCE

15.    At all times relevant to this Complaint, Handy has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

### Misleading Advertisements

16.    Since at least 2019, to entice consumers to become Pros, Handy has run tens of thousands of advertisements ("Pro Ads") on third-party sites such as Craigslist, Facebook, Snagajob, and Talroo, as well as its website, www.Handy.com ("website"). These Pro Ads, in many instances, contain false, unsubstantiated, or otherwise misleading earnings claims.

Moreover, many Pro Ads misleadingly claim that Pros can get "Paid Daily" or "as soon as the job is done."

*False, Unsubstantiated, or Otherwise Misleading Advertisements for Cleaning Pro Pay*

17.    Cleaning is one of the most common job types found on the Handy App. But in several high-demand markets, Handy advertises pay rates for cleaners that are virtually impossible for most Pros to achieve. As described below, in many instances, "Cleaning Pros" do not earn the advertised rate due to onerous and undisclosed conditions Handy imposes as a prerequisite for them to achieve the advertised rate.

18.    Handy uses a four-tiered payment system for Cleaning Pros in parts of New York, New Jersey, and California based on the number of jobs the Pro completes and the rating the Pro receives. The higher tier a Pro reaches, the more the Pro can earn per hour. For instance, a tier-one cleaning Pro in Hudson County, New Jersey, earns $16 an hour, whereas if that Pro reaches tier-two, tier-three, or tier-four, they earn $18, $21, and $23 an hour, respectively. To move up tiers, Pros must complete a certain number of jobs and be highly rated by Requesters in the preceding 28-day period.

19.    Cleaning Pros in tiered regions generally begin making tier-one earnings, but Handy's ads frequently advertise the tier-four pay rate. To achieve and maintain a tier-four rating, Handy requires Pros to have completed 50 cleaning jobs in the prior 28 days and maintain a Pro rating of 4.75 out of 5 stars. The vast majority of Cleaning Pros have not been paid the tier-four wages that Handy advertises.

20.    Handy has routinely advertised that Cleaning Pros in tiered regions can "earn up to" the tier-four hourly rate, without disclosing the material conditions or limitations of its tiered payment system. For instance, between 2019 and 2022, Handy ran hundreds of Pro Ads on Craigslist in tiered regions that advertised tier-four earnings, as shown in Figure A. This Westchester County, New York ad from April 2022, advertised the tier-four rate of $23 an hour. By contrast, tier-one cleaners in that region earned $16 an hour, tier-two earned $18 an hour, and tier-three earned $21 an hour.



**Figure A**, exemplar of a Handy ad run in Westchester County, New York in April 2022.

21.    Since at least 2019, Handy has been aware that the vast majority of Cleaning Pros, whether in Westchester County or in most of the other tiered regions, do not reach tier-four earnings. For instance, in August 2019, a Handy product designer wrote to Handy's Director of Operations and Customer Experience, "In general we see high pro churn rates after the first job is completed," meaning many Pros are completing only one job, not the required 50 in a 28-day period to achieve tier-four pay. Further, Handy's own May 2021 analysis of two months of data

from five tiered regions showed that out of 243 active Cleaning Pros who had reached tier-two status or higher, only 43 had reached tier-three, and only *one* reached tier-four.

22.    In many non-tiered regions, Handy pays Cleaning Pros either an hourly "Base Rate" pay, or a higher hourly "Repeat Rate" pay. Handy pays the "Base Rate" to Cleaning Pros who complete a job for a Requester for the first time through the Handy App and the "Repeat Rate" only to Cleaning Pros who complete a job with a Requester for whom the Cleaning Pro has previously worked. The "Repeat Rate" is generally several dollars more per hour than the "Base Rate" of pay. For instance, a Cleaning Pro in Atlanta can earn $15 an hour as their "Base Rate" but $18 an hour as their "Repeat Rate." However, Handy has run hundreds of Pro Ads that advertise only the higher "Repeat Rate" of pay, without disclosing that this rate is reserved for repeat jobs.

### *False, Unsubstantiated, or Otherwise Misleading Handyman and Furniture Assembly Pro Pay Advertisements*

23.    Since at least 2019, Handy has run thousands of Pro Ads with misleading earnings claims seeking to recruit consumers to work handyman and furniture assembly jobs ("Handyman Pros" and "Furniture Assembly Pros"). For instance, starting in approximately April 2021, Handy began claiming in Craigslist Pro Ads that Handyman and Furniture Assembly Pros in multiple regions "Earn up to $45/hour, per job." An example of such an ad is shown in Figure B. But the vast majority of Handyman and Furniture Assembly Pros in many of the regions where these Pro Ads ran were not paid the advertised wage. Rather, according to Handy's data, median Handyman and Furniture Assembly Pro pay in these regions during this time, after accounting for Handy's deduction of fines and fees, was in many instances at least $20 per hour less than the advertised hourly wage. Further, less than 10% of Pros in many of the regions where these Pro Ads ran earned the advertised wage.



**Figure B**, Handy ad run in Ithaca, New York in June and July 2021.

24.    Handy is aware that Pro Ads, including Ads for Furniture Assembly and Handyman Pros, have promised false, unsubstantiated, or otherwise misleading wages. On February 7, 2022, the FTC issued a Civil Investigative Demand ("CID") to Handy, which sought, among other things, information on earnings claims Handy had made in advertisements. By February 11, 2022, Handy personnel had met to discuss "rationalizing pro pay" and changes to Pro pay that needed to be made. On February 15, 2022, Handy's then Associate Director of Growth and Marketing expressed concern to co-workers about the accuracy of the earnings claims in Handy's advertisements. Approximately a week later, Handy began modifying its advertised earnings claims for Furniture Assembly and Handyman Pros, significantly reducing the advertised Pro pay rate in multiple regions. For instance, an advertisement that ran in Las

Vegas claiming Pros earn "Up to $45/hr assembling furniture" was changed to "Up to $16/hr assembling furniture."

25.     However, even with the changes implemented, Pro Ads continued to make false, unsubstantiated, or otherwise misleading earnings claims. For example, Handy ran multiple ads throughout 2022 claiming Handyman Pros in Lynchburg earn "up to $72.63/hr", but Handy's own internal data shows that during this period the median Handyman Pro in Lynchburg only earned approximately $38 an hour, and only approximately 10% of Pros in the region earned the advertised wage.

*False, Unsubstantiated, or Otherwise Misleading Advertisements for Lawn Care Pros*

26.     Beginning in August 2021, Handy ran ads on Craigslist for Pros who provide lawn care services ("Lawn Care Pros") which claimed that such Pros "Earn $62/hour, per job" as shown in Figure C.



**Figure C**. Ad run in hundreds of Handy regions in 2021.

27.     Around this same time, Handy also ran ads on Facebook that claimed Lawn Care Pros earn "up to $53/hr." A screenshot of one of these ads, which ran in dozens of regions, is shown in Figure D.



**Figure D**. Clip of Facebook ad from 2021 that ran in multiple regions.

28.    Over the next several months Handy ran hundreds of misleading "Earn $62/hour, per job" and/or "up to $53/hr" ads in approximately one hundred different regions. However, the vast majority of Lawn Care Pros in these regions did not earn $53 per hour, let alone $62 per hour. According to Handy's data, the median pay for Lawn Care Pros in 2021 in many of the regions where these ads ran, after accounting for Handy's deduction of fines and fees, was only a fraction of the advertised rates, at least $26 an hour less than advertised, and only 10% or less of Pros in almost all these regions earned the advertised wage. Further, while these ads were running, Handy's Director of Category Management wrote in an email to several other managers that with recent changes to Pro pay, "our median mowing pay will be $24-25 per hour."

<u>*False "At Least" Earnings Claims*</u>

29.    Beginning in June 2022, on or about the same time that Handy rebranded to Angi Services, the company changed the phrasing in many of its advertisements from "earn up to" a certain amount per hour, to "earn at least" a certain amount per hour. With the change in language, many of these ads continue to be false.

30.    For example, in June 2022, Handy ran an ad in Springfield, Massachusetts, claiming Pros earn "at least $72.08/hr." However, the vast majority of Handyman Pros in that regions did not earn $72.08 an hour during this time. According to Handy's data, the median Handyman Pro pay in that region during that timeframe, after accounting for fines and fees, was only $43 an hour. Only approximately 10% of Handyman Pros in this region earned "at least $72.08/hr."

31.    Additionally, in September 2022, Handy ran ads on Craigslist that claimed Cleaning Pros earn "at least" $25 an hour in Sacramento, and "at least" $26 an hour in Los Angeles, two cities where Cleaning Pros are paid on a tiered system. But these advertised rates were either tier-three or tier-four pay, while most Cleaning Pros in these regions have continued to earn only tier-one Pro pay, several dollars less per hour than advertised.

32.    Further, that same month Handy ran an ad on Craigslist in its Hudson Valley region that claimed Lawn Care Pros "Earn at least $28/hour." However, the vast majority of Lawn Care Pros in that region did not earn $28 per hour during this time. For example, according to Handy's data, the median Lawn Care Pro pay in that region during the timeframe, after accounting for Handy's deduction of fines and fees, was at least 10% per hour less than the advertised "at least" claim. Only approximately 25% of Lawn Care Pros in the region earned $28 per hour.

33.    Further, in November of 2022, Handy ran an ad in its Poconos region that claimed Handymen Pros earn "at least $57/hr." However, the vast majority of Handyman Pros in that regions did not earn $57 an hour during this time. For example, according to Handy's data, the median Handyman Pro pay in that region during that timeframe, after accounting for fines and fees, was only $47 an hour. Only 25% of Handyman Pros in this region earned $57 per hour.

34.    In yet another example, in April 2023, Handy ran ads on Craigslist in New York City that claimed Pros "Earn at least $24/hr assembling furniture." However, Handy's own internal data show that during this period approximately half of the furniture assembly jobs in New York City paid less than the $24 an hour advertised wage. For instance, if the furniture assembly job originated through Handy partner Wayfair, it only paid $15.75 an hour, approximately one third less than the advertised rate.

*False, Unsubstantiated, or Otherwise Misleading Earnings Claims on Handy's Website*

35.    Virtually all third-party Pro Ads direct consumers to Handy's website, which is where consumer job seekers must go to become a Pro. From at least February 1, 2019, through June 23, 2022, the website published false, unsubstantiated, or otherwise misleading earnings claims. Specifically, the onboarding page displayed a section with a large "$" sign that said "GREAT PAY" which claimed Pros make up to $22/hour as a cleaner, $45/hour as a handyman and $62/hour as a Lawn Care Pro. *See* Figure E.



**Figure E**, Handy.com Pro onboarding page, provided by Handy.

36.     Handy's advertised earnings claims were false, unsubstantiated, or otherwise misleading. Handy did not pay the vast majority of Pros the advertised hourly rates.

37.     Consumers have alerted Handy to the fact that its website advertised false, unsubstantiated, or otherwise misleading earnings claims. For instance, in September 2021, a month before the FTC served Handy with its Notice, a Pro in Memphis complained to Handy:

> [W]hy does it state clearly on your home website that lawn care pros can make up to $62 per hour/job. It is stated clearly and in plain sight…Handy is misrepresenting itself. This is not even close to what I'm getting paid, it is not a slight misrepresentation, it is actually off by almost 3x what we are making…It is False advertising.

38.     Additionally, Pro pay varies by geographic region, but Handy did not tailor the advertised earnings claims on its website to any geographic region but instead published its claims to millions of consumers across the country. In many regions the vast majority of Pros did not earn the advertised rates.

### *False, Unsubstantiated, or Otherwise Misleading "per hour," "per week," and "in 60 days" Earnings Claims*

39.     On many occasions, Handy's Pro Ads include claims that Pros can earn certain wages in a specified period. The time component of these Pro Ads includes "per hour" as seen in Figures A-E, "per week," and "in 60 days."

40.     Handy lacks a reasonable basis to support these claims.

### *Deceptive Advertisements Regarding Timing of Pro Payments*

41.     Handy typically pays Pros within seven business days of a completed job. But since at least April 2021, in thousands of job postings on Craigslist, Handy represents, without qualification, that Pros will be "Paid Daily." Many Pros are low-income earners that rely on getting paid quickly. Further, in many other Pro Ads, including those run on Facebook, Handy represents that "You're able to cash out on the app as soon as the job is done." *See* Figure F.

14



**Figure F**, snippet from Facebook ad.

42.    These ads are deceptive because to be paid sooner than the seven-day default,

Pros must: (i) pay Handy at least a $1.99 fee from the Pro's pay and (ii) be "tenured", meaning

they have already been paid $50 for a completed Handy job(s).

43.    Since at least 2019, the $1.99 fee Handy charges Pros to be paid daily has resulted

in more than $1.5 million being deducted from Pro pay.

44.    Consumers have alerted Handy that its "Paid Daily" ads are misleading. For

instance, in September 2021 one consumer complained to Handy "when I applied it stated paid

daily[.] That is false…. This last week I struggled to get the gas so [I] could work counting on

the paid daily lie that you falsely stated."

**Inadequate Disclosure of Fines and Fees**

45.    Between 2019 and 2022, more than 170,000 Pros completed at least one job

through Handy. During this same time Handy assessed Pros with fines and fees in over 300,000

instances, resulting in tens of millions of dollars being deducted from Pro pay. However, Handy fails to disclose its fines and fees in the advertisements that lure consumers to its website or on any webpage that a consumer must navigate to become a Pro.

46.    During the sign-up process, consumer job seekers would only discover the possibility of these fines and fees by clicking on a hyperlink to Handy's Service Professional Agreement ("SPA"), a document that is more than 8,000 words and is replete with legalese, where the fine and fee schedule is displayed only at the very end. Many consumer job seekers complete the sign-up process on a mobile phone, which displays the SPA in small font, and requires additional scrolling to read than would be required with the use of a desktop or laptop computer. Therefore, many consumer job seekers submit their application to become Pros unaware that Handy's fines and fees can be deducted from their Pro pay.

47.    Consumers who seek to become Pros must first input basic personal information before selecting a "Get Started" button on Handy's website, as shown in Figure E. The Pro applicant is then taken to a second Handy webpage to enter additional personal information and submit their application. At the bottom of this second page, immediately above a button labeled "Submit Your Application," is a box the applicant must click to acknowledge, amongst other things, three separate hyperlinks. Consumers can check this box and submit their application to become a Pro without having to open, let alone read, the hyperlinked information. *See* Figure G.



**Figure G**, checkbox with hyperlinks.

48.     The first hyperlink, "Terms of Use," if clicked, directs the consumer to a more than 16,000-word document that pertains almost exclusively to Requesters, not Pros.

49.     A second hyperlink, titled "Service Professional Agreement," is wedged between the first hyperlink, other text, and a third hyperlink labeled "Privacy Policy." If clicked, this hyperlink directs the consumer to the lengthy SPA document described above. Buried at the end of the SPA is a section called "Liquidated Damages Service Failure/Cancellation," which is a schedule consisting primarily of fines and fees Handy can deduct directly from Pro pay. The fines, which internally Handy has at times referred to as "penalties," are assessed for various actual or perceived infractions, such as not showing up to a job, showing up late to a job, or cancelling a job within specified time frames.

50.     Upon clicking the "Submit Your Application" button, the potential Pro must then wait for Handy to conduct a background check, which can take several days to complete. Until the spring of 2020, Pros had to pay a fee for the background check to be conducted. Once the background check is completed, the Pro can begin using the App to search and claim jobs.

51.     Because Handy does not adequately disclose the fees deducted from Pro pay, and because Handy's claims about Pro pay do not take into account fines and fees that are deducted

from Pro pay, many Pros do not discover until they have completed a job that their earnings are significantly less than the amount Handy claimed.

### Handy's Undisclosed Protocol for Avoiding Fines and Receiving Pay for Requester No-Shows

52.     Since at least 2019, in thousands of instances, Requesters have either instructed a Pro not to show up for a job while failing to cancel the job directly with Handy, or failed to provide the Pro access to the job site. All these scenarios, which Handy refers to as "Customer No Show" or "CNS," arise through no fault of the Pro. Nevertheless, because the job appears incomplete, Handy imposes a "Pro No Show" (or "PNS") fine, typically $50, on the Pro.

53.     To avoid this fine and receive compensation for time lost, a Pro must follow a complicated, undisclosed multi-step protocol ("CNS protocol").

54.     Specifically, the Pro must 1) allow the App to access their phone's GPS location, 2) check in on the App upon arrival at the job site, 3) attempt to reach the Requester in a manner that Handy can track via the Pro's phone, and 4) if unable to reach the Requester, wait at the job site for 30 minutes while 5) continuing to reach out to the Requester in a manner that Handy can track via the Pro's phone. Handy requires Pros to follow each of these steps, and failure to comply with any step may result in a fine or failure to receive payment.

55.     Handy fails to disclose that Pros must comply with this CNS protocol, and follow all these steps in it, to avoid being charged a fee and get paid for their effort. The CNS protocol is not referenced in the SPA, any webpage a job seeker is required to view to sign up to become a Pro, or in any Pro Ads.

56.     Handy provides the public, as well as Pros, access to a help center that contains over one hundred hyperlinks to articles on various topics. Until at least 2023, three of these hyperlinked articles provided limited information on Handy's CNS protocol, but none disclosed

all steps Handy requires Pros to follow to avoid Handy's $50 PNS fine and get paid for their time and effort.

57.     Specifically, these hyperlinked articles failed to disclose that the Pro must allow the App to access their GPS location, nor did they address steps required if a Pro was unable to activate GPS or the App due to cell coverage or technological issues. Further, two of the articles failed to list all the requirements, such as the requirement that the Pro must check in on the App upon arrival at the job site.

58.     Additionally, only one of the articles explicitly states that all the steps it outlines must be followed, while another states "we recommend contacting the customer" and "Try contacting your customer a few more times," implying Handy is only providing recommendations, not requirements that must be met to avoid a fine and get paid. Consequently, many Pros are unaware of the CNS protocol, or that they are required to do anything, if a customer cancels the request with the Pro or doesn't allow the Pro access to the job site.

59.     Handy deducts PNS fines, like all its fines and fees, from future Pro earnings. For example, if a Pro was assessed a $50 PNS fine for not following Handy's undisclosed CNS protocol, the Pro may see a negative balance on their account. The Pro will then have to work the next job(s) either for free, or at an effectively discounted hourly rate, to pay off the debt owed to Handy.

60.     Many Pros only learn of the required CNS protocol, or all its steps, if they dispute the PNS fine with Handy customer service or request payment for their time and effort, at which point Handy typically informs the Pro of the multiple step protocol they were required to follow.

61.     Despite the many issues that Pros encounter, Handy does not have a phone number for them to contact its customer support team, even in urgent situations such as the Pro

being unable to access a job site. Regardless of the urgency, Pros can only reach Handy with an inquiry or complaint via chat or email, which is not always possible due to glitches with the App or lack of internet service. Handy's response to many Pro inquiries or complaints is to provide form responses that either just cite to the SPA or its undisclosed CNS protocol. In some instances, Handy customer service tells Pros, via chat or email, that the CNS protocol is outlined in the lengthy SPA, which is not true.

### Defendant's Activities in New York

62.     Handy's transactions with Pros, and the unfair and deceptive acts that are the subject of this complaint, largely take place in New York.

63.     For example, Handy's principal place of business is in New York, New York, where its corporate headquarters are located, where its corporate officers work, and where they direct, control and coordinate activities for Handy.

64.     At least the initial decisions concerning the content of the SPA and marketing language that are the subject of this complaint were made at these headquarters.

65.     Handy's relationship with Pros is also centered in New York. Handy requires that everyone that registers as a Pro consent to its SPA. That agreement states that if a dispute arises between Handy and the Pro, the Pro must first attempt to negotiate the dispute informally by sending written notice to Handy at an address Handy maintains in New York, New York. The agreement also states that Pros must initiate or opt out of arbitration by providing written notice to Handy at that address in New York.

66.     In addition, Handy requires that every user that registers an account at the Handy website, including Pros, must consent to the "Terms of Use & User Agreement." That agreement states that it "is governed and interpreted pursuant to the laws of the State of New York." It also

20

states that for "all Disputes not subject to arbitration, You agree to submit to the personal and exclusive jurisdiction and venue of the courts located within the county of New York, New York." Handy directs users to send questions regarding the agreement to an address the company maintains in New York.

### FTC's Notice of Penalty Offenses

67.     By letter dated October 26, 2021 ("Letter"), the FTC served on Defendant a copy of the Notice, as referenced in Paragraphs 1 and 8, *supra*. Defendant received the Letter and Notice on or about October 27, 2021.

68.     The Letter and Notice summarize Commission determinations in prior litigated cases that particular acts or practices similar to those alleged above in Paragraphs 17-40 and 45-61, *supra*, are penalty offenses, in that they are deceptive or unfair, are unlawful under Section 5(a)(1) of the FTC Act, and are prohibited by final cease and desist orders.

69.     As detailed in the Notice, the Commission has determined, in a series of litigated decisions, that it is an unfair or deceptive trade practice and violation of Section 5(a)(1) of the FTC Act to make false, misleading, or deceptive representations concerning the earnings that may be anticipated by a participant in a money-making opportunity. Without limitation, the Notice specifically highlights Commission determinations that it is an unfair or deceptive trade practice to:

- "misrepresent, explicitly or implicitly that participants will or are likely to earn any specific amount";

- "misrepresent the profits or earnings that may be anticipated by a prospective participant by failing to disclose conditions or limitations affecting such income"; and

- "represent, explicitly or implicitly, the earnings which may be secured by participants, when the representation is made without knowledge, or with

only limited knowledge, of the actual profits or earnings usually and ordinarily received by participants."

70.     As noted in the Letter, in connection with the litigated Commission determinations cited in the Notice, the Commission issued final cease and desist orders, other than consent orders, prohibiting such acts or practices.

71.     Defendant's receipt of the Letter and Notice placed Defendant on notice of its potential liability for civil penalties under Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), for knowingly engaging in acts or practices determined by the Commission to be unfair or deceptive and unlawful that are prohibited by the Commission's cease and desist orders.

72.     The Letter instructed Defendant to contact Commission staff if it had any questions or to visit the Commission's website at www.ftc.gov/MMO-notice and https://www.ftc.gov/enforcement/notices-penalty-offenses/penalty-offenses-concerning-endorsements to obtain copies of the case decisions discussed in the Notice.

73.     As referenced in Paragraph 24, *supra*, over three months later, in early February 2022, the FTC served Defendant with a CID seeking documents and information pertaining to, among other things, Defendant's earnings claims in its advertisements and its substantiation for these earnings claims.

74.     Despite receiving service of the Letter and Notice and of the FTC's CID, Defendant continues to engage in the deceptive and unfair conduct alleged above.

75.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission because, among other things Defendant:

- engaged in its unlawful acts and practices repeatedly over a period of years;

- engaged in its unlawful acts and practices knowingly;

- earned significant revenues from participating in these unlawful acts and practices;

- continued its unlawful acts or practices despite knowledge of numerous complaints; and

- remains in the business and maintains the means, ability, and incentive to continue its unlawful conduct.

## VIOLATIONS OF THE FTC ACT

76.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

77.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

78.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

**Count I**
**Misrepresentations Regarding Earnings**
**(By Plaintiff FTC)**

79.     In numerous instances in connection with the advertising, marketing, promotion, or offering of household service job opportunities, Defendant represents, directly or indirectly, expressly or by implication, that Pros will earn or are likely to earn income, including specific hourly amounts.

80.     In numerous instances in which Defendant makes the representations described in Paragraph 79, Defendant's representations are false or misleading or have not been substantiated at the time the representations were made.

81.     Therefore, Defendant's representations constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**
**Deceptive Claims Regarding Getting Paid as Soon as a Job is Done**
**(By Plaintiff FTC)**

82.     In numerous instances in connection with the advertising, marketing, promotion, or offering of household service job opportunities, Defendant represents directly or indirectly, expressly or by implication, that Pros will be "Paid Daily" or "as soon as the job is done."

83.     In numerous instances when Defendant makes the representations in Paragraph 82, Defendant's representations are false or misleading at the time the representations were made.

84.     Therefore, Defendant's representations constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count III**
**Failure to Disclose Fines and Fees**
**(By Plaintiff FTC)**

85.     In numerous instances in connection with the advertising, marketing, promotion, or offering of household service job opportunities, Defendant represents directly or indirectly, expressly or by implication, that Pros will earn or are likely to earn income, including specific hourly amounts.

86.     In numerous instances when Defendant makes the representation in Paragraph 85, Defendant fails to disclose or disclose adequately fines and fees that Defendant will deduct from

Pro pay. This additional information would be material to consumer job seekers in deciding to become a Pro.

87.     In light of the representations described in paragraph 85, Defendant's failure to disclose or disclose adequately the material information constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count IV**
**Unfair Collection of Fines and Failure to Pay Pros**
**(By Plaintiff FTC)**

88.     In numerous instances, as set forth in Paragraphs 52-61, Defendant imposes fines on, and denies compensation to Pros who cannot complete a job due to the actions of Requesters unless the Pros comply with an undisclosed multi-step protocol.

89.     Defendant's acts or practices cause or are likely to cause substantial injury to consumers that they cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

90.     Therefore, Defendant's acts or practices constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**VIOLATIONS OF PRIOR COMMISSION DETERMINATIONS CONCERNING**
**UNFAIR OR DECEPTIVE ACTS OR PRACTICES**

91.     If the Commission has determined in a proceeding under Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), that an act or practice is unfair or deceptive and issued a final cease and desist order, other than a consent order, with respect to the act or practice, then a person, partnership, or corporation that engages in such act or practice with actual knowledge that such act or practice is unfair or deceptive and is unlawful under Section 5(a)(1) of the FTC Act shall be liable under Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B).

92.     In prior litigated decisions the Commission has determined that the acts or practices described in Paragraphs 17-40 and 45-61, above, are unfair or deceptive and violate Section 5(a)(1) of the FTC Act, and issued final cease and desist orders, other than consent orders, with respect to those acts or practices.

## COUNT V
### Violations of Prior Commission Determinations Known to Defendant
### (By Plaintiff FTC)

93.     As set forth in Paragraphs 67-74, at least since receiving the Notice and associated Letter in October 2021, Defendant has had actual knowledge that, in connection with the advertising or promotion of money-making opportunities like the Handy household service job opportunities, making false, misleading, or deceptive earnings claims is an unfair or deceptive act or practice, and unlawful under Section 5(a)(1) of the FTC Act.

94.     In numerous instances, since receiving the Letter and Notice, Defendant has represented, directly or indirectly, expressly or by implication, that consumer job seekers will earn or are likely to earn income, including specific hourly amounts for performing household service jobs.

95.     In truth and in fact, in numerous instances in which Defendant made the representations, consumer job seekers did not or were not likely to earn the hourly wages that Defendant advertised, marketed, and promoted.

96.     Since at least October 2021, Defendant has engaged in the acts or practices with the actual knowledge that in prior litigated decisions the Commission has determined that the acts or practices are unfair or deceptive and violate Section 5(a)(1) of the FTC Act and issued final cease and desist orders, other than consent orders, with respect to those acts or practices.

## VIOLATIONS OF NEW YORK STATE LAW

### COUNT VI
### REPEATED FRAUDULENT OR ILLEGAL ACTS
### (By Plaintiff NYAG)

97.    The NYAG repeats and re-alleges paragraphs 1 through 96 above, as if fully set forth herein.

98.    N.Y. Exec. Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated or persistent fraudulent business conduct.

99.    As set forth above, Defendant has engaged in repeated and persistent fraudulent acts, including but not limited to:

a.    Misrepresenting to consumers, directly or indirectly, expressly or by implication, that Pros will earn or are likely to earn income, including specific hourly amounts;

b.    Misrepresenting to consumers, directly or indirectly, expressly or by implication, that Pros will be "Paid Daily" or "as soon as the job is done"; and

c.    Failing to disclose or disclose adequately fines and fees that Defendant will deduct from Pro Pay.

100.    Defendant's acts or practices constitute repeated and persistent fraudulent conduct in violation of N.Y. Exec. Law § 63(12).

### COUNT VII
### DECEPTIVE ACTS OR PRACTICES AND FALSE ADVERTISING
### (By Plaintiff NYAG)

101.    The NYAG repeats and re-alleges paragraphs 1 through 100 above, as if fully set forth herein.

102.    N.Y. GBL §§ 349 and 350 prohibit deceptive acts and practices and false advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in the state of New York.

103.    As set forth above, Defendant has engaged in deceptive acts and practices and false advertising in violation of N.Y. GBL §§ 349 and 350, including but not limited to:

      a.    Misrepresenting to consumers, directly or indirectly, expressly or by implication, that Pros will earn or are likely to earn income, including specific hourly amounts;

      b.    Misrepresenting to consumers, directly or indirectly, expressly or by implication, that Pros will be "Paid Daily" or "as soon as the job is done"; and

      c.    Failing to disclose or disclose adequately fines and fees that Defendant will deduct from Pro Pay.

## CONSUMER INJURY

104.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, N.Y. Exec. Law § 63(12), and N.Y. GBL §§ 349 and 350 by Defendant;

B.    Award monetary and other relief to redress injury to consumers resulting from Defendant's violations of N.Y. Exec. § 63(12), and N.Y. GBL §§ 349 and 350, including but not limited to restitution, damages, and the disgorgement of ill-gotten monies; and

C.    Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:  January 3, 2025

**FOR THE FEDERAL TRADE COMMISSION:**

EDWARD HYNES
New York Bar No. 4887584
DAVID ALEX
Texas Bar No. 24003256
ANNE LEJEUNE
Texas Bar No. 24054286
TAMMY CHUNG
New York Bar No. 5745476

Attorneys Southwest Region
Federal Trade Commission
1999 Bryan St., Ste. 2150,
Dallas, Texas 75201
(214) 979-9381; ehynes@ftc.gov
(214) 979-9370; dalex@ftc.gov
(214) 979-9370; alejeune@ftc.gov
(214) 979-9399; tchung@ftc.gov

**LETITIA JAMES**
**Attorney General of the State of New York**

CLARK P. RUSSELL
New York Bar No. 2848323
Deputy Bureau Chief
JORDAN S. ADLER
New York Bar No. 4605556

Senior Enforcement Counsel
Bureau of Internet and Technology
New York State Attorney General
28 Liberty St.
New York, New York 10005
(212) 416-8433 (voice)
(212) 416-8369 (fax)